JULIAN C. SMITH ET AL., EXECUTORS AND TRUSTEES, *v.* HORACE S. WHITMAN ET AL.

[No. 61, April Term, 1930.]

*Decided June 24th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Raymond S. Williams* and *William Stanley,* with whom were *Robert H. Archer, John S. Stanley,* and *Hershey, Donaldson, Williams & Stanley* on the brief, for the appellants.

*Philip H. Close,* for the appellees.

PATTISON, J., delivered the opinion of the Court.

On the west side of the Chesapeake Bay, just south of the mouth of the Susquehanna River, in Harford County, Maryland, is located Spesutia Island, containing approximately 1,900 acres of land. This island was originally one farm with a single owner, but many years ago it was divided into three farms, known as the Upper, Middle, and Lower Island Farms.

The Lower Island Farm, which is at the southern end of the island, consisting of about 970 acres of land, and 35 acres on the main land west of Spesutia Narrows, through which there is a private road ending at a wharf or ferry landing, which was used in reaching the island, was, in 1915, owned by one Robert H. Smith, who died in that year. By his will the lands mentioned were devised unto Julian C. Smith, Chapman S. Clark, and Frederick Von Kapff, the first two of whom are the appellants in this case, subject to the use thereof for four years from the date of his death by his daughter Nannie M. Clark, wife of Chapman S. Clark, in trust to divide, apportion and assign, pay over and convey to the beneficiaries named in his will. On October 6th, 1917, the Congress of the United States passed an act providing for the purchase of a proving ground and the payment of damages and losses resulting from the taking of all land for such purpose, and on the 16th day of October, 1917, pursuant to said act, the President of the United States issued a proclamation declaring certain lands in Harford County, Maryland, including the lands devised to said trustees, to be necessary for the establishment of a proving ground. This proclamation contained a provision that possession and title to all lands embraced therein, including all easements, rights of way, etc., that could not be procured by purchase on or before October 20th, 1917, might immediately thereafter be taken on behalf of the United States by the Secretary of War or his duly accredited representatives. Thereafter officers of the United States Army went upon the island, and told its owners that the Government of the United States had taken over the island, and ordered them to vacate the same and deliver possession thereof to the United States on or before December 1st, 1917, which order was accepted by them.

Thereafter, on the 14th day of December, 1917, the President of the United States issued a second proclamation, which, as therein stated, superseded the prior proclamation of October 16th, 1917, and all provisions of the prior proclamation that were inconsistent with the latter were thereby revoked. The lands taken over by the last proclamation did

not include any part of the Lower Island Farm on Spesutia Island, but did include the main land terminal of the ferry, consisting of said thirty-five acres, with the road passing through it, which was the main means of ingress and egress, other than by water, to and from the island. Immediately after taking over said lands, the owners of the Lower Island Farm were refused the right to use the private road within the limits of the proving ground, except at the will and by the permission of those in authority at the proving ground, and, when permitted, they were to use it under the severest restrictions, including an inspection of their baggage, packages, etc., by the government officials.

In the year 1918, Spesutia Narrows and a part of Spesutia Island, including a large part of the Lower Island Farm, were declared to be in the danger zone from gun and aerial bombs from the United States Proving Ground, and the public, including the plaintiffs, were warned not to enter that zone, and from time to time the officers of the United States Army fired shells from anti air craft guns, several of which burst on said land. One of these shells burst very close to the front porch of the house occupied by Mrs. Clark and her family. There were, in addition thereto, other acts of the government which interfered with the owners' free and full use and enjoyment of the Lower Island Farm.

After the issuance of the proclamation of December 14th, 1917, which by its terms did not include the land upon the island, the trustees of Robert H. Smith sold all the Lower Island Farm on Spesutia Island for $50,000. Five hundred acres of it, consisting of marsh lands, were sold to Converse and Monnell for $35,000, and the remainder, 470 acres, upon which the buildings and improvements were located, were sold to Nannie M. Clark for $15,000; and thereafter, on May 17th, 1926, Mrs. Clark sold 162.5 acres of it to Arthur H. Stump for $9,200, leaving Mrs. Clark the owner of approximately 307.5 acres, upon which the buildings were located, which she, on June 1st, 1929, sold for $90,000.

The President of the United States, acting through the Aberdeen Proving Ground Land Purchasing Commission, on February 14th, 1918, made an award of compensation of $3,000 for the aforesaid taking of the thirty-five acres tract, which amount was unsatisfactory to the trustees, and no compensation was paid to them.

About this time, the trustees of Robert H. Smith sought and obtained the services of Mr. Stevenson A. Williams, a prominent attorney of Bel Air, in an effort to obtain from the government what they thought was a just compensation for the taking of the thirty-five acres upon the mainland, and the damages resulting therefrom to their land upon the island, or if it should be found that, by the acts of the government, there had also been a taking of their land upon the island, then to obtain just compensation for the taking of that land. Thereafter Horace S. Whitman, an attorney of Washington, D. C., the other appellee in this case, was employed to serve with Mr. Williams in an effort to obtain such compensation for the trustees, and, not being able to effect a satisfactory settlement with the government, they brought suit against the United States in the United States Court of Claims for the recovery of said compensation, which was prosecuted to a successful conclusion, whereby the defendant received from the government $63,500, with interest thereon at six per cent. per annum from December 14th, 1917, to February 14th, 1918, together with interest on a part thereon, $61,250, from February 4th, 1918 (date of award), until paid, which interest amounted at the time of its payment to $42,572.29; making the total amount received by the trustees $106,072.29. Of the $63,500 awarded to the trustees, $15,-000 was for the taking of the thirty-five acres of the mainland, and $48,500 as damages to the remainder of their land upon the island, resulting from the taking of the thirty-five acres.

The voucher for the compensation awarded, $106,072, was made payable to the trustees, and, when it came to a settlement with the attorneys for their services, there was a disagreement as to the amount owing them, which it seems they

were unable to reconcile. Whereupon the sum of $20,624.93 was paid to the attorneys, Messrs. Williams and Whitman, and the balance which they claimed was owing them, $13,-561.25, was by agreement "deposited in bank in escrow" subject to joint order of the trustees and Messrs. Williams and Whitman, until such time as the court might decide what additional amount the said attorneys were entitled to receive for their services.

The attorneys, Messrs. Williams and Whitman, thereupon, on the 7th day of November, 1929, brought suit against the trustees for the balance of the fee claimed to be owing them, then on deposit in bank. The declaration contains four of the common counts and one special count in which it was alleged that the defendants employed them to prosecute and collect their above mentioned claim against the United States, "and agreed with the plaintiffs, in consideration of such services to pay them.* * * a fee or compensation therefor equal to one-third of the amount which they as attorneys might recover for said estate from the United States, after deducting the amount of the original award to the said trustees made by the commission, appointed by the President and War Department for the purpose of valuing the lands taken for the Aberdeen Proving Ground, * * * and the plaintiffs accepted the said employment upon the said terms and endeavored, for a long period of time, to negotiate a settlement for said claim with the War Department, but failing in said effort and with the approval of the defendants, brought suit against the said United States in the United States Court of Claims * * * and rendered all necessary and proper services in the conduct of said suit, and thereby recovered the sum of $106,-072.29, and collected the said sum of money by a voucher or check of the Treasury Department of the United States drawn to the order of the defendants, and delivered said voucher to the defendants, who received the money therefor, whereby the defendants as the representatives of said estate, became indebted to the plaintiffs to an amount equal to one-third of the amount so recovered as aforesaid, but the defendants refused and declined to pay the plaintiffs the said amount so

agreed to be paid them and still refused to pay the same, though requested so to do." The general issue pleas were filed by the defendants and issues were joined thereon by the plaintiffs. The case was tried upon the issues so framed, and a verdict was rendered thereon in favor of the plaintiffs for the sum of $13,561.25, and a judgment was entered upon the verdict. It is from that judgment this appeal was taken.

In the trial of the case thirty-one exceptions were reserved; of these, thirty were to the rulings of the court on the evidence, and one to its rulings on the prayers. The plaintiffs offered six and the defendants nine prayers, all of which were refused except the first prayer of the plaintiffs. Special exceptions were filed to this granted prayer of the plaintiffs, but were overruled.

The granted prayer of the plaintiffs which, in effect, directed a verdict for the plaintiffs, is as follows: "The uncontradicted evidence in this case shows that the defendants employed the plaintiffs as their attorneys to prosecute the claim referred to in the evidence, and undertook and promised to pay the plaintiffs for their services in that behalf, an amount equal to one-third (1/3) of the amount they might recover for the defendants, less the sum of three thousand dollars ($3,000) which had been awarded to the defendants by the Aberdeen Proving Ground Land Commission, and that the plaintiffs prosecuted said claim to a successful conclusion, whereby there was recovered by the defendants the sum of $106,072.29 and thereby the plaintiffs became entitled to receive from the defendants the sum of $34,186.18, being one-third (1/3) of the total award of $106,072.29, after deducting therefrom the amount of said award of $3,000, with proper interest thereon, amounting to $3,513.75, whereof the defendants paid to the plaintiffs the sum of $20,624.93, and there remains due and owing to the plaintiffs under the aforesaid agreement the sum shown by the agreement of July 20, 1929, offered in evidence, and which was deposited in escrow under said agreement; and therefore, the court directs the jury to find their verdict in favor of the plaintiffs for the said amount as shown by said agreement to which amount the

jury may in their discretion add interest from the 20th day of July, 1929."

It is urged by the appellants that the court, in granting the plaintiffs' first prayer, erred in not requiring the jury to find the facts therein stated upon which it based its direction to the jury to return a verdict in favor of the plaintiffs.

In the early case of *Charleston Ins. Co. v. Corner,* 2 Gill, 426, where the facts proven were uncontradicted, and in which was granted an instruction similar in character to the prayer granted in this case, the court said: "Doubtless the jury would have found these facts according to the testimony, but the sufficiency of evidence to satisfy a jury or the circumstance that it is all on one side, does not authorize the court to direct the jury, that it proves the fact. They have the power to refuse their credit, and no action of the court should control the exercise of their admitted right, to weigh the credibility of evidence. In thus incautionsly expressing their opinion, the court erred." See *Brown v Ellicott,* 2 Md. 72; *Boyd v. McCann,* 10 Md. 118; *McCosker v. Banks,* 84 Md. 292; *Calvert Bank v. Katz,* 102 Md. 56; *Lemp Brewing Co. v. Mantz,* 120 Md. 176.

In *Calvert Bank v. Katz,* the court, in speaking of an instruction like the one in this case, said: "It usurped entirely the function of the jury. It found for them the ultimate facts, which it was their province to find, to wit, the indebtedness of the defendant and the amount and told them that these facts which had been put in issue by the pleadings and were contested throughout had been established as a verity by undisputed evidence. It is error for the court to assume the existence of facts and take away from the jury the finding of the same". See *Lemp Brewing Co. v. Mantz, supra.*

In the prayer of the plaintiffs granted in this case are found a number of facts, which are assumed to be true by the court, and the jury are told, without being required to find the existence of such facts, to render a verdict in favor of the plaintiffs. The granting of this prayer, in our opinion, is against the rule above laid down supported by the authorities cited. Had the facts stated in the prayer been submitted

to the findings of the jury, with the instructions that if they found such facts existed they should find for the plaintiffs, we are of the opinion that such instruction would have been a proper one, but as such facts were not left to the finding of the jury, the prayer, we think, should not have been granted.

The defendants' A, first, second, third, fourth, fifth and sixth prayers all asked for a directed verdict for the defendants. Their A prayer asked for such verdict because of an alleged variance between the pleading and the evidence. By the pleadings recovery was sought upon an alleged contract between the plaintiffs and the defendants whereby the plaintiffs were to be paid for their services one-third of the amount recovered by them in said suit brought by the defendants against the United States, which was never paid them.

In the trial of the case evidence was offered by the plaintiffs tending to show the value of the plaintiffs' services in that case, and that the value of their services was not less than one-third of the amount recovered therein. This evidence was objected to and, the objection being overruled, exceptions were noted thereto. The admission of this evidence, if inadmissible because of its variance with the pleading, would not warrant a directed verdict for the defendants, if there was evidence in the case legally sufficient to go to the jury in support of the contract sued on, and there was, we think, ample evidence produced in this case in support of that contract, and in so holding we find no errors in the court's rulings upon the defendant's first and second prayers, which are demurrers to the evidence. Which evidence we will not set out herein, as we feel it altogether unnecessary and to do so would have the effect only of prolonging this opinion.

The defendants' third prayer was to the effect that, in as much as the defendants were advised by the plaintiffs that interest was not recoverable upon their claim, it should not be included in the amount recovered upon which their fee was to be computed and ascertained. The defendants were told by the plaintiffs that in their opinion interest would not be allowed on their claim. Such it seems was then the practice of the United States Court of Claims, but thereafter, on

March 23rd, 1923, in an opinion handed down by the Supreme Court, interest was allowed on a claim of this class, the same being regarded by that court as essential to the requirement that in such case the party whose land was taken or damaged should receive just compensation therefor. The defendants were notified of this opinion, and thereafter efforts were made by the plaintiffs to obtain interest on their claim, in which effort they were successful. The plaintiffs were to receive no compensation for their services if unsuccessful in recovering more than the amount that had been awarded to the defendants by the commission. It was only in the event of their getting something in addition thereto that they were to be paid at all for their services, and it is difficult for us to accept the proposition that, because at the beginning of the suit it was not thought that interest would be allowed on their claim, and the plaintiffs had so expressed that belief, that the interest was not to be included in the amount recovered upon which the extent of the defendants' compensation depended. The evidence discloses that the amount received by the defendants upon their claim exceeded the expectations of both themselves and their attorneys, and because of that fact the fees were larger than the defendants had contemplated, but while this is so, the amount they received was likewise much greater. The whole matter, we think, is explained in a conversation between Mr. Williams and Mr. Clark, occurring at the time of their refusal to pay one-third of the amount including interest, when the plaintiffs had delivered to them a voucher which was made payable to them. As stated by Mr. Williams, their refusal to pay to the plaintiffs one-third of the whole amount referred to "led to some discussion between us and in the course of which I found Mr. Clark was very firm in their view that they would not pay any part on the interest. I said to him, 'Why, Mr. Clark, don't you think the service rendered was all right?' 'Fine' he said, 'fine, could not have been better.' I said, 'Didn't you recover a great deal more than you expected to recover in the case?' He hesitated a moment at that and finally, when I pressed him for an answer to that, he said, 'Well, I must confess we

recovered more than we thought we would ever get.' I said, 'Then why do you make that contention?' 'Oh, well,' he said, 'I tell you paying you thirty thousand dollars is unreasonable, it is unreasonable, the services were not worth any such figure.' " It is true that the amount of the fee was large, but it must be remembered that the employment of the plaintiffs extended over a period of ten years, and much work was done by them. The suit was upon a contract whereby the plaintiffs were to be paid a contingent fee of one-third of the amount recovered, which amount, in our opinion, included not only the sum awarded to the trustees for the land taken and the damage to other lands caused by such taking, but also the amount received as interest thereon, and the right of the plaintiffs to recover one-third of the entire amount, principal and interest, awarded to the trustees, was in no way affected by the fact that the plaintiffs at one time told the defendants that in their opinion no interest could be collected upon their claim. The defendants' third prayer was, we think, properly refused.

The defendant's fourth and fifth prayers are the same, with the exception that the fourth asked for a directed verdict for the defendants upon the facts therein stated, while the fifth prayer submitted the finding of such facts to the jury, with instructions to them that if they find those facts to exist the verdict should be for the defendants. Mr. Clark, the trustee, it seems, was more or less disturbed over the thought that the Court of Claims might regard what had been done by the government and its representatives as a taking not only of the thirty-five acres on the main land, but also the island land. These lands had been sold, as already stated, to Messrs. Converse and Monnell and to Mrs. Clark for the sum of $50,000, and Mrs. Clark had sold a portion of the lands bought by her to Judge Stump for the sum of $9,200, which sales would be void if there were a taking of the island land, as such taking would be prior to the sales mentioned, in which event he felt that the trustees would have to reimburse the purchasers at least to the amount paid by them for the lands they had bought. And, while in this frame of

mind, he, on January 9th, wrote to Mr. Williams suggesting what he apprehended might occur, and, not knowing what amount might be awarded to the trustees for all the lands so taken, he assumed for illustration that the amount received would be $100,000. From this amount, he subtracted the amount paid by the purchasers of the lands sold, together with the award "already made," as he expressed it, which in all amounted to $65,925.00, leaving net to the trustees $34,075. Of this amount he suggested that Messrs. Williams and Whitman should receive one-third, or $11,358.33, and the trustees, two-thirds, or $22,716.66, and he asked Mr. Williams, if his apprehensions were realized, would he be willing to a settlement on that basis. Mr. Williams replied, as stated in the prayer, that the same would be satisfactory to him and he thought it would likewise be satisfactory to Mr. Whitman, but he would submit it to him. These prayers give to this answer of Mr. Williams the effect that he recognized the fact that under the contract any interest recovered was not to enter into the amount upon which the fee was to be ascertained, in as much as no interest was mentioned in this statement made by way of illustration. The award when made was on an entirely different basis from the one suggested. The island land was not regarded as having been taken by the government, and the defendants were not required to repay to said purchasers the money received from them, and the net amount actually received under the award made, instead of being, as the defendants had apprehended, only $34,075, was over $100,000. While the plaintiffs, upon the solicitation of Mr. Clark, might have been willing, upon his statement, where the trustees would receive so little, to have disregarded the interest in the computation to be made in estimating their fee, it certainly should not be regarded as a recognition that under the contract interest was not to be considered when the trustees were not subjected to the apprehended payments to the purchasers, and when the net amount of the award received by the trustees was over $100,000. Moreover, when the letter of Mr. Clark and the reply thereto of Mr. Williams was written, the decision of the

490

Supreme Court on March 23rd, 1923, had not been handed down. Consequently the omission of interest in the statement contained in Mr. Clark's letter, and the reply of Mr. Williams thereto, cannot be given the significance here sought by the trustees. These prayers, we think, were both properly refused.

The defendants' sixth prayer was likewise properly refused for the reasons we have stated in affirming the rulings of the court in refusing the defendants' third prayer, and their seventh prayer was also properly refused, because of the reasons we have given in sustaining the court's rulings in refusing their fourth and fifth prayers.

The defendants' eighth prayer, the ordinary burden of proof prayer, should, we think, have been granted.

The first eight, as well as the twenty-first, twenty-second, twenty-third, twenty-fifth, and twenty-sixth exceptions were to the rulings of the court upon evidence tending to show the character and extent of work done by the plaintiffs in their efforts to recover compensation for the defendants. It was essential that the plaintiffs should show that they did what they under the contract were required to do. If they went more fully into what they did than was necessary, there was no reversible error in the admission of this evidence under the instructions given, and the same may be said as to the exceptions to the admission of evidence showing the value of the work done by the plaintiffs. Under the pleadings and the bill of particulars filed, confining the amount to be recovered to the contract sued upon, this evidence may not have been admissible, but there was no reversible error in admitting it, in view of the instructions given, nor do we find any reversible error in the other exceptions to the rulings.

The judgment appealed from will be reversed because of the error committed in granting the plaintiffs' first prayer, and in refusing the defendants' eighth prayer.

*Judgment reversed; new trial awarded; appellees to pay the costs.*